# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**BRIO CORPORATION,**

　　　　　　　　　Plaintiff,

　　　　　　　　　　　　　　　　　　**Case No. 06-C-1001**

　　　**v.**

**MECCANO S.N.,**

　　　　　　　　　Defendant.

---

## DECISION AND ORDER

---

This action arises out of defendant Meccano S.N.'s ("Meccano") termination of its distribution agreement with plaintiff Brio Corporation ("Brio"). In May 2001, Brio and Meccano entered into a distribution agreement entitled "Distributor Agreement," pursuant to which Meccano granted to Brio the exclusive right to sell Meccano's Erector brand of toy within the United States. Meccano unilaterally terminated the agreement in September 2005, and the parties engaged in negotiations regarding the repurchase of Brio's inventory of Meccano products. Brio was not satisfied and brought suit in Wisconsin under the Wisconsin Fair Dealership Law ("WFDL") and other causes of action.

Brio asserts that it is a "dealer" and that the Distributor Agreement constitutes a "dealership" under the WFDL. Brio contends that the termination notice did not comply with the requirements of the WFDL and that Meccano did not have good cause for terminating the Distributor Agreement in violation of the WFDL. Brio also contends that when Meccano ended its relationship with Brio, it was obligated to repurchase all of Brio's

inventory of Erector products at the fair wholesale market value of the inventory. Brio further asserts that Meccano made oral promises to repurchase Brio's inventory.

Meccano removed this action from Washington County Circuit Court, invoking the Court's diversity jurisdiction. *See* 28 U.S.C. § 1332. The Court has jurisdiction because the suit is between a citizen of Wisconsin and a citizen or subject of a foreign state and the amount in controversy exceeds $75,000, exclusive of interest and costs. *Id.*

Pursuant to Rules 56 and 12(b)(3) of the Federal Rules of Civil Procedure, Meccano moves this Court for an order granting Meccano summary judgment and dismissing Brio's claim that Meccano violated the WFDL. Meccano argues that Brio was not a WFDL dealer. Meccano contends that Brio was not "situated in" Wisconsin under the WFDL and that there was no "community of interest" between Brio and Meccano relating to the sale of Meccano's products in Wisconsin. Meccano further argues that if Brio's WFDL claim is dismissed, this entire cause of action should be dismissed for improper venue based upon the Distributor Agreement's forum selection clause, which requires that all disputes be resolved in the Commercial Court of Calais, France. For the reasons that follow, Meccano's motion is denied.

## BACKGROUND

To clarify the dispute in this case, the Court will briefly set forth the background facts on which the parties appear to agree. When there is a dispute, the Court has so indicated. The Court will further set forth facts directly relevant to the dealership issue, including any

-2-

disputed facts, when the Court discusses the legal issue of whether or not the WFDL is applicable to this case.

Brio is a Wisconsin corporation with its principal place of business in Germantown, Wisconsin. Brio is in the business of buying and reselling toys as a distributor. (Meccano's Proposed Findings of Fact ("DPFOF") ¶ 2.) Meccano is a French company, organized under the laws of France, that manufactures various types of toys and construction kits that are sold worldwide under the Meccano name and in the United States under Meccano's well-known Erector brand name. (DPFOF ¶ 1.)

In May 2001, Brio became Meccano's exclusive distributor of its Erector brand toys in the United States and entered into a written distribution agreement with Meccano, entitled "Distributor Agreement."[1] (DPFOF ¶ 4.) The term of this "Distributor Agreement" was as follows: "[t]his Agreement shall come into effect upon signature and shall remain valid until December 31, 2003. After this date, this Agreement shall be rolled over for succeeding periods of one year at a time, unless otherwise terminated by either party upon three months written notice and provided that both parties agree upon the relevant Quotas (Section 5)." (Kwaterski Decl. ¶ 1, Ex. 1, § 3.) The agreement further provided that if Brio was "terminated," Meccano would be entitled to determine at "its sole discretion" whether it would authorize Brio to sell the remaining inventory or ask for return of the remaining

---

[1]Prior to Brio's exclusive appointment, Nikko America ("NAI") distributed Erector brand play sets in the United States. NAI served as Meccano's distributor for less than one year. Meccano terminated NAI's appointment based on its inability to promote and sell Erector sets to the "specialty market," which included smaller "mom and pop" toy stores. (Plaintiff's Proposed Findings of Fact ("PPFOF") ¶¶ 1-3.)

Case 2:06-cv-01001-RTR   Filed 02/10/10   Page 3 of 50   Document 99

inventory "at landed costs." (*Id.* at § 13.2.) The agreement also provided that it was to be governed and construed in accordance with the laws of France and that the parties would submit to "the exclusive jurisdiction of the Tribunal de Commerce de Calais, FRANCE." (*Id.* at § 14.) Brio was appointed by Meccano specifically to focus on the specialty market and move into "mass market" outlets such as Wal-Mart and Toys R Us. (Kwaterski Decl. ¶ 5, Ex. 5, Ingberg Dep. 20:14-22.)

Timothy O'Connor ("O'Connor") became President and Chief Executive Officer of Brio in January 2003. O'Connor attests that the strategic nature of the business relationship between Meccano and Brio was to reintroduce the Erector business within the specialty toy distribution channel, focusing on small regional chains and hobby shops. (PPFOF ¶ 5.) O'Connor contends that Brio quickly gained a sustainable and growing business within the specialty toy retail channel. Meccano and Brio then began to develop an Erector line to pursue in the mass market channel of the United States toy business. About 85% to 90% of the domestic toy business was concentrated among five top mass market accounts. (PPFOF ¶ 6.) Meccano contends that Brio could have done more with respect to its service of the specialty market and specifically identified Brio's lack of marketing as the main area where Brio could have performed better. (Def.'s Resp. to PPFOF ¶ 6.)

Kay Thompson ("Thompson"), Brio's Senior Marketing Manager, led the strategic development of the Erector mass market line. Brio contends that its efforts in the mass market were very successful, and it managed to gain distribution in nearly all of the major mass market channels. (PPFOF ¶ 7.) Meccano contends that Michael Ingberg ("Ingberg"),

Meccano's Managing Director, was responsible for introducing the Erector brand to Wal-Mart and Brio was not able to deliver a mass marketer like Wal-Mart domestically. (Def.'s Resp. to PPFOF ¶ 7.)

It is undisputed that in June of 2004, Brio and Meccano entered into a distribution agreement entitled "Additional Agreement," which supplemented and amended the parties' May 10, 2001, Distributor Agreement. (DPFOF ¶ 5.) The "Additional Agreement" provided that "[a]ll sections not expressly mentioned in the present 'Additional Agreement' remain unchanged and valid." (Kwaterski Decl. ¶ 2, Ex. 2 at 1.) Brio and Meccano's "Additional Agreement" further provided that: "[t]he Agreement is rolled over for a one year period with effect as from January 1, 2004 and ending on December 31, 2004. After this date, this Agreement shall be rolled over for succeeding periods of one year at a time, unless otherwise terminated by either party upon three months written notice." (*Id.* at § 3.)

O'Connor contends that by 2004 it became clear to both Brio and Meccano that a new agreement was necessary in order to address issues particular to the mass market. (PPFOF ¶ 8.) Meccano denies this and points to the additional agreement entered into by the parties in June 2004, which supplemented the terms of the parties' May 10, 2001, Distribution Agreement. (Def.'s Resp. to PPFOF ¶ 8.) Brio contends that the Distributor Agreement was designed to generate sales and distribution in the specialty channel and it did not reflect the realities of the mass market. (O'Connor Aff. ¶ 6.) Ingberg testified that "there was a plan discussed with Brio from the beginning which was we start with the specialty market and we

-5-

go to the mass market, [a] two step [plan]." (Kwaterski Decl. ¶ 5, Ex. 5, Ingberg Dep. 20:14-22.)

O'Connor contends that the parties exchanged many drafts of proposed new agreements, even though no specific agreement was ever finalized. According to O'Connor, Ingberg and O'Connor both expressed that, while the parties were working toward a new agreement geared toward the mass market, they would be content to operate without a written contract.[2] (O'Connor Aff. ¶ 7.) Brio contends that there is a dispute as to whether the parties' written Distribution Agreement was in effect in September of 2005.

Brio and Meccano met in Paris in June 2005. One purpose of the June 2005 Paris meeting was to determine whether the parties could agree on terms for a new long-term contract. Ingberg told O'Connor that Meccano had several options and that he needed to study those options. Insofar as Meccano was concerned, any new contract was an uncertainty. (PPFOF ¶ 12.) Brio contends that, unknown to Brio, for many months Meccano had been discussing with NAI the details regarding NAI's succession of Brio as the exclusive distributor of Erector sets in the United States. (PPFOF ¶ 13.) Meccano contends that Brio was aware that throughout 2005, Meccano was discussing with various potential distributors, including NAI, the possibility of a future agreement to distribute the Erector products in the United States for calendar year 2006. (Def.'s Resp. to PPFOF ¶ 13.)

---

[2]Meccano denies that during 2004, the parties exchanged many drafts of proposed new agreements, even though no specific agreement was ever finalized. Brio has not produced any drafts of a proposed new agreement. The parties, however, have produced the additional agreement, which was entered into in June 2004 and supplemented the May 10, 2001, Distribution Agreement. (*See* Kwaterski Decl. ¶ 2, Ex. 2.)

-6-

At this juncture, the evidence is not clear as to when Meccano began discussions with NAI. In a June 29, 2005, email from O'Connor to Ingberg, O'Connor acknowledges that Brio knew Meccano was considering moving the business to NAI. (Kwaterski Decl. ¶ 8, Ex. 8.) A July 7, 2005, email from Ingberg to Bob Grey ("Grey") of NAI, notes prior conversations in Dallas and New York and further notes that Meccano would consider a business relationship between Meccano and NAI if certain points could be confirmed, such as the duration of the new contract, minimum purchase expectations, minimum marketing expectations, and personnel issues, including Meccano's recommendation that NAI hire Thompson, the head of Brio's marketing department. (Beilfuss Decl. ¶ 1, Ex. 1, Ingberg Dep., Ex. 4.) One of those points was that NAI will "accept to purchase the stock of continued item from [B]rio, inc. to have a clean situation on the US market." (*Id.*) The email further noted that Meccano "will announce our move only in [S]eptember after all purchase[s] from [B]rio have been paid." (*Id.*) Ingberg testified that the issue of repurchase of inventory was "part of the negotiation" between Meccano and NAI. (*Id.* at 74.) By August 2005, email correspondence between Ingberg and Grey suggests that Meccano and NAI had reached an agreement. (*Id.* at Ex. 5.)

Regardless, it is undisputed that a distributor agreement between Meccano and NAI was entered into and was effective as of September 24, 2005. (*Id.* at Ex. 7.) On September 7, 2005, Meccano and Brio met in Copenhagen. Brio contends that this meeting was organized under the guise of Meccano wanting to review its 2006 marketing plans with Brio, when all the while Meccano had already decided to replace Brio, as the exclusive distributor,

-7-

with NAI. Meccano contends that the parties addressed Meccano's concerns about Brio's poor performance with respect to Brio's failure to meet Meccano's marketing quotas and sales purchase quotas. Meccano asserts that Ingberg did not decide between NAI and Brio until Ingberg "had the two [] proposals [i]n hand" after the September 7, 2005, Copenhagen meeting with Brio. (Kwaterski Decl. ¶ 5, Ex. 5, Ingberg Dep. 93:19-96:22.)

In any event, it is undisputed that on September 20, 2005, Meccano provided written notice to Brio that as of December 31, 2005, Brio would cease to be Meccano's distributor of its Erector brand products in the United States. Meccano's notice of nonrenewal to O'Connor from Ingberg stated as follows:

> Following our last meeting in Copenhagen on [September] 7th and after re-studying your last offer regarding the ERECTOR distribution for year 2006 and followings, I have the regret to inform you that we have decided not to continue the distribution of our product line in USA through BRIO, inc.
>
> We considered various aspect[s] in order to make our decision:
>
> 1st as explained to me, in your future new organization ERECTOR set is [] seen as a non strategic issue in BRIO inc.
> You need to restructure BRIO inc. in a smaller company and I do understand your concern regarding the general spending [which] do[es] not match with our current needs to grow our business.
>
> 2nd as I mentioned to you ERECTOR brand is at a turning point, it means that we need a real investment in terms of Marketing/TV, such spending that BRIO inc. never allocated to our brand.
>
> 3rd as I mentioned to you, you need to restructure your sales approach in order to match with our requirements to have real mass sales team to look after ERECTOR. It will take time to find the[se] people[] and to [organize] this structure.
>
> It was not an easy decision but [w]e don't think that BRIO inc. is today the best partner to distribute ERECTOR brand in the USA.

-8-

We will of course try to help you in the best way with the eventual stock you can have by end of this year.

The [authorization] to distribute ERECTOR will last until the end of this current year, i.e., [D]ecember 31st.

(Kwaterski Decl. ¶ 9, Ex. 9.)  Brio acknowledges that it received a September 20, 2005, email.  Brio denies, however, that this email constituted a termination notice or complied with the requirements of the WFDL.

After receiving the notice of nonrenewal, on September 23, 2005, Brio sent to Meccano a list of its current inventory levels.  The attachment to the email confirmed that Brio's stock of Erector sets at the time was valued at $3,610,207.  (Beilfuss Decl. ¶ 1, Ex. 1, Ingberg Dep., Ex. 14.)  Meccano had no opinion, one way or the other, whether the amount of inventory Brio was stocking was excessive.  (PPFOF ¶ 26.)  Meccano contends that from the time Brio was notified in September 2005, that Meccano would not be renewing Brio's distribution agreement with Meccano, the parties, as well as NAI, began having discussions about what Brio should do with any remaining Erector inventory.  Brio contends that at the September 7, 2005, meeting in Copenhagen, Meccano promised to repurchase Brio's inventory.  Brio contends that promise was later memorialized in a December 6, 2005, email from Ingberg and accepted by Brio.  Meccano denies that it promised to Brio to repurchase Brio's outstanding Erector inventory.  Meccano further avers that the parties' Distributor Agreement provided Meccano the option to repurchase Brio's remaining Erector inventory.  (Kwaterski Decl. ¶ 1, Ex. 1 at § 13.2.)

On December 6, 2005, Ingberg sent O'Connor an email setting forth a possible solution regarding the disposition of Brio's Erector inventory:

> please find enclosed our proposal regarding the stock situation in Brio inc
>
> the first draft is the quantity which NAI will take before end of the year.
>
> the second draft is the quantity that NAI will take on or before mid [F]ebruary 2006[.] [P]lease get in touch with Bob Grey from NAI for the precise procedure.
>
> the third draft is the balance quantity that NAI won't run, we will take this quantity on a base of our sale price to you +15% (landed cost), (we will close out all these items) and ask you a payment term on [A]pril 1st [2006].
>
> Please note that we believe that our offer is very fair in particular in view of the unexpected and unusual level of stock carried by Brio Inc. (vs 2005 Brio yearly sales).

(Kwaterski Decl. ¶ 23, Ex. 23.) Meccano also contends that Ingberg's December 6, 2005, email set forth a proposal to move forward and negotiate the repurchase of Brio's remaining Erector inventory, but lacked essential terms, and required that Brio negotiate with NAI regarding a portion of the inventory. Ingberg testified that he was surprised by the high amount of inventory that Brio was predicting it would have at the end of 2005 and that he believed some of Brio's remaining inventory of Erector products should have been sold during prior years and an even bigger portion of the inventory should have been earmarked for customers who already placed orders for the 2005 holiday season. Ingberg further testified that Brio's excess inventory of Erector products demonstrated to Meccano that Brio had not been doing its job in selling and promoting the products and had not properly forecast its need for inventory. Brio counters that Brio's inventory level did not accurately

-10-

reflect Brio's performance and instead, Meccano forced Brio to purchase inventory that Brio did not need and did not want, much of which was undesirable product. In March 2005, Brio had an inventory reduction plan to close out approximately $271,000 of its Erector inventory. Brio also committed to Meccano that it would sell and close out outdated and discontinued Erector inventory.

On December 14, 2005, O'Connor sent an email to Ingberg responding to the December 6, 2005, email. This December 6, 2005, email attached a number of exhibits and a proposed letter agreement entitled "Letter Agreement for repurchase of Erector inventory" that O'Connor asked Ingberg to sign. O'Connor's email provided in pertinent part:

> Attached is a fair and final proposal to complete the transition to [NAI]. We have worked with your desire to receive the goods in three "waves" and have accommodated the needs of [NAI] to preserve the sales momentum on Erector.
>
> Because we are rapidly approaching year-end, we ask that you reply/approve the attached agreement as quickly as possible.

(*Id.* at Ex. 26.) On December 18, 2005, Brio subsequently sent an email stating that the prices it was seeking in the December 13, 2005, letter were not correct. The December 18, 2005, email attached a revised version of the December 13, 2005, letter, now dated December 16, 2005. Meccano contends that the contents of O'Connor's email and the attached documents included terms, such as a letter of credit for the full amount of the entirety of the inventory, not contemplated by Meccano. Both Brio's December 13, 2005, letter and its revised December 16, 2005, letter set forth new and additional terms that altered the proposal in Ingberg's December 6, 2005, email. (Kwaterski Decl., Exs. 22, 26; Kwaterski Suppl. Decl. ¶ 5, Ex. D.) Meccano never signed the proposed letter agreement.

-11-

The parties dispute what transpired with regard to the repurchase of inventory. Brio sold a portion of its inventory, which the parties refer to as "Wave 1," to NAI at the beginning of 2006 for a little over a million dollars. Brio claims that NAI's payment for Wave I merchandise was $65,000 short. Brio contends that its "landed cost" for the inventory was $1,084,739 and that NAI only paid $1,019,739. As for the inventory sold via Wave II, Brio sold the inventory to TJ Maxx in May 2006 for a claimed loss of $291,085. As for Wave III, Brio received a bid from Liquid XS, a customer in the close-out market, for the balance of the Wave III inventory, for which Brio's landed cost was $295,000. Liquid XS proposed to purchase this inventory for just over $90,000. Brio contends that it had already sold $112,000 worth of Wave III merchandise at a loss of $19,000. Brio contends that was able to sell Wave 3 at a loss of approximately $223,000. Suffice it to say that the parties were unable to amicably resolve the repurchase of Brio's inventory of Meccano product and Brio filed suit in April 2006.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Celotex,* 477 U.S. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24. In analyzing whether a question of fact exists, the

-12-

Court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247-48. While a material fact is one that is "outcome determinative under the governing law," *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir. 1990), a genuine issue as to that material fact is raised only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## THE WISCONSIN FAIR DEALERSHIP LAW

The WFDL's purposes are to promote the public's interest in the relationships between dealers and grantors, and to protect dealers against unfair treatment by grantors, who may use their superior economic and bargaining powers to the disadvantage of small business owners.[3] *Cent. Corp. v. Research Prods. Corp.*, 681 N.W.2d 178, 186 (Wis. 2004).

---

[3]Section 135.025(2) of the Wisconsin Statutes states, in relevant part, as follows:

The underlying purposes and policies of this chapter are:
(a) To promote the compelling interest of the public in fair business relations between dealers and grantors, and in the continuation of dealerships on a fair basis;
(b) To protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships;
(c) To provide dealers with rights and remedies in addition to those existing by contract or common law;
(d) To govern all dealerships, including any renewals or amendments, to the full extent consistent with the constitutions of this state and the United States.

Wis. Stat. § 135.025(2).

-13-

The statute is to be "liberally construed and applied to promote its underlying remedial purposes and policies." Wis. Stat. § 135.025(1). The WFDL, however, does not apply to every business relationship, but instead, "reaches only to those business relationships properly classified as 'dealerships.'" *Frieburg Farm Equip., Inc. v. Van Dale, Inc.*, 978 F.2d 395, 398 (7th Cir. 1992).

The central issue before the Court is whether the business relationship between Meccano and Brio was a "dealership" entitled to the protections of the WFDL. The WFDL provides dealers with rights and remedies in addition to those existing in contract or common law. Wis. Stat. § 135.025. For example, the WFDL mandates that a dealer receive 90 days notice before termination, and that a dealer be allowed 60 days to rectify any claimed deficiency. Wis. Stat. § 135.04. The WFDL applies only to a "dealer," which is defined by the statute to mean "a person who is a grantee of a dealership situated in this state." Wis. Stat. § 135.02(2). In order to determine if the WFDL applies to a given business relationship, the Court must determine if the parties' relationship is a dealership with one party being the dealer and the other party being the grantor of the dealership. Under the WFDL, "dealership" means:

> A contract or agreement, either express or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wis. Stat. § 135.02(3)(a). A community of interest "means a continuing financial interest between the grantor and the grantee in either the operation of the dealership business or the

-14-

marketing of such goods or services." Wis. Stat. § 135.02(1). There is no bright line rule for determining whether a community of interest exists between the parties. In fact, the Wisconsin Supreme Court referred to determining a "community of interest" as the "most vexing element." *Cent. Corp.*, 681 N.W.2d at 187

In *Central Corp.*, the Wisconsin Supreme Court reviewed *Ziegler Co. v. Rexnord*, 407 N.W. 2d 873 (Wis. 1987), its prior precedent, and discussed two "guideposts" which, if satisfied, would lead to the conclusion that the parties share a community of interest. The first guidepost is whether the parties share a continuing financial interest. *Centr. Corp.*, 681 N.W. at 187 (citing *Ziegler*, 407 N.W. 2d 873). A dealer can manifest a continuing financial interest in the relationship by, among other things, investing in grantor-specific inventory and facilities. *Ziegler*, 407 N.W.2d at 880. The second guidepost is whether the parties share an interdependence, which may be characterized as "the degree to which the dealer and the grantor cooperate, coordinate their activities and share common goals in their business relationship." *Id.* at 879. These guideposts require an alleged dealer "to demonstrate a stake in the relationship large enough to make the grantor's power to terminate, cancel or not renew a threat to [its] economic health[.]" *Id.*

The Wisconsin Supreme Court identified ten "facets" to the guideposts that should be considered when determining whether or not a community of interest exists.

> Facets which a court should examine to determine whether the grantor and grantee have a continuing financial interest in the business relationship and whether the business relationship is so interdependent that there is a community of interest include: how long the parties have dealt with each other; the extent and nature of the obligations imposed on the parties in the contract or agreement between them; what percentage of time or revenue the alleged

-15-

dealer devotes to the alleged grantor's products or services; what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services; the extent and nature of the alleged grantor's grant of territory to the alleged dealer; the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos); the extent and nature of the dealer's financial investment in the inventory facilities and good will of the alleged dealership; the personnel which the alleged dealer devotes to the alleged dealership; how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; the extent and nature of any supplementary services provided by the alleged dealer to consumers.

*Id.* at 879-80.

In applying the WFDL, the Seventh Circuit has distilled this dual guidepost, multi-faceted test into two crucial factors: "(1) the percentage of revenues and profits the alleged dealer derives from the grantor and (2) the amount of time and money an alleged dealer has sunk into the relationship." *Home Protective Servs., Inc. v. ADT Sec. Servs., Inc.*, 438 F.3d 716, 719 (7th Cir. 2006) (citing *Baldewein Co. v. Tri-Clover, Inc.*, 606 N.W.2d 145, 151 (Wis. 2000)). The Seventh Circuit has stated the one primary inquiry as follows: "The ultimate question is whether the grantor has the alleged dealer 'over a barrel' – that is, whether it has such great economic power over the dealer that the dealer will be unable to negotiate with the grantor or comparison shop with other grantors." *Id.* at 719. Indeed, the "overriding principle [is] whether the business' status is dependent upon the relationship with the grantor for its economic livelihood." *Moodie v. Sch. Book Fairs, Inc.*, 889 F.2d 739, 742-

-16-

43 (7th Cir. 1989).[4]  The Seventh Circuit has further opined that the purpose of the WFDL is to prevent "suppliers from behaving opportunistically once franchisees or other dealers have sunk substantial resources into tailoring their business around, and promoting a brand." *Kenosha Liquor Co. v. Heublein, Inc.*, 895 F.2d 418, 419 (7th Cir. 1990).

In *Central Corp.*, the alleged dealer, Central, sold humidifiers, air cleaners, and zoning systems to installer contractors.  The alleged grantor, Research, manufactured heating, ventilation, and air conditioning equipment, including Aprilaire brand products, such as humidifiers, air cleaners, zone controls, and thermostats.  The parties had a 20-year business relationship, but no written distributorship agreement.  Central distributed Research's Aprilaire products in northeastern Wisconsin for ten years, then expanded its territory to include Milwaukee and Madison.  Central carried no brands that directly competed with the Research's products.  Central provided Aprilaire literature and information to its contractor customers, who then passed along the information to consumers.  Central promoted Aprilaire products when it called on installer contractors, and occasionally, Research's employees made sales calls with Central's employees.

Central derived approximately eight to nine percent of its sales and profits from the sale of Aprilaire products.  Central argued that if it did not carry the Aprilaire line, it would lose business because its customers would buy from a wholesaler that carried all of the

---

[4]The Wisconsin Supreme Court stated as follows: "[T]he law was meant to protect only those small businessmen who make a substantial financial investment in inventory, physical facilities or 'goodwill' . . . .  It is these types of businesses whose economic livelihood would be imperiled by the termination of their dealership without good cause or adequate notice."  *Foerster, Inc. v. Atlas Metal Parts Co.*, 313 N.W.2d 60, 63 (Wis. 1981).

products they needed, instead of buying only a few items from multiple wholesalers. Central contended it would take years for it to replace the business and sales that the Aprilaire products brought to its business. Although Research did not require the alleged dealer to maintain inventory, Central's inventory fluctuated from about $44,000 to $70,000. Central also replaced defective parts that were covered under Research's warranties and kept approximately $5,000 of spare parts inventory on hand. Central absorbed the overhead costs of warranty work, such as delivery, handling and paperwork, associated with the replacement parts. Central's owners also built a new warehouse to store the inventory of Central's products, which included Aprilaire products. Central leased 7,000 square feet of warehouse space and claimed that approximately 2,000 square feet of such warehouse space was intended to store Aprilaire's product inventory. Central arranged for cooperative advertising of Aprilaire products approximately twice a year.

The Wisconsin Supreme Court concluded that summary judgment was improperly granted to Research. In holding that summary judgment should not have been granted, the court cited the following facts, from which it determined reasonable alternative inferences could be drawn: "the parties' 20 year business relationship; Central's owners' significant financial investment in the construction of a warehouse based, in part, on the amount of Research's products it housed; Central's practice of keeping a substantial amount of Research's product in inventory; Research's desire to limit Central's sales to a specific territory; and Central's practice of keeping spare parts for Research's products on hand for sale, at cost, to its customers." *Centr. Corp.,* 681 N.W.2d at 180. The Wisconsin Supreme

Court further recognized that while eight to nine percent did "not comprise a large percentage of Central's gross revenues or profits, this fact alone is not dispositive, but is a matter to be weighed by the trier of fact." *Id.* at 189. *Central Corp* is an important decision to consider because this Court, sitting in diversity and applying state law, is required to apply state law as the highest court of the state interprets it. *See Commonwealth Ins. Co. v. Stone Container Corp.*, 323 F.3d 507, 509 (7th Cir. 2003).

In this case, the Court must determine whether a community of interest existed between Meccano and Brio, taking the facts in a light most favorable to Brio, the non-moving party. When the material facts are undisputed, the community of interest question is a question of law for the court to determine. *See Frieburg Farm Equip.*, 978 F.2d at 398; *Super Natural Distribs., Inc. v. Muscletech Research and Dev.*, 196 F. Supp. 2d 761, 770 (E.D. Wis. 2002). However, in *Central Corp.*, the Wisconsin Supreme Court stated that "[w]here there are genuine issues of material fact or reasonable alternative inferences drawn from undisputed material facts, the determination of whether there is community of interest is one which will be made by the trier of fact based on an examination of all the facets of the business relationship." 681 N.W.2d at 180. Therefore, when the facts are undisputed the community of interest question is a question of law for the court, and only when the underlying facts are disputed is the community of interest a question to be decided by the trier of fact. *See Home Protective Servs. v. ADT Sec. Servs., Inc.*, 348 F. Supp. 2d 1010, 1015 n.9 (E.D. Wis. 2004). In *Home Protective Services*, the parties agreed that the community of interest issue is one of law. *Id.* In this case, Meccano contends that the Court

-19-

can resolve whether Brio is afforded the protection of the WFDL on summary judgment, while Brio contends that genuine issues of material fact prevent the Court from resolving the issue. The Court must also determine whether Brio's alleged dealership was "situated in this state." Wis. Stat. § 135.02. The Court will determine whether a community of interest existed between Meccano and Brio by first evaluating the "facets" as set forth in *Ziegler*.

**Facet One: How long the parties have dealt with each other**.

The parties' relationship was four and half years. The case law demonstrates that this length of a relationship is not a decisive factor. *Beloit Beverage Co. v. Winterbrook Corp.*, 900 F. Supp. 1097 (E.D. Wis. 1995) (no community of interest despite a thirteen-year relationship between the parties); *Guderjohn v. Loewen-Am., Inc.*, 507 N.W.2d 115 (Wis. Ct. App. 1993) (no community of interest despite four-year relationship). In *Guderjohn*, the appellate court commented that "[i]f duration has significance, it is this: [the distributorship] did not last long enough to cement interdependence between the parties. *Id.* at 120. The Court determines that this short duration of time weighs against finding a community of interest, however, the finding may be impacted if the parties' relationship demonstrated the requisite interdependence.

**Facet Two: The extent and nature of the obligations imposed on the parties in the contract or agreement between them.**

The Distributor Agreement imposed substantial obligations upon Brio to buy, sell, and promote Meccano products. In particular, the Distributor Agreement required minimum purchases referred to as "Quotas" and minimum sales. (Kwaterski Decl. ¶ 1, Ex. 1 at § 5.) For example, in 2003, the Distributor Agreement required that Brio make minimum

-20-

purchases of $3,500,000 of Meccano product and make minimum sales of $6,500,000 of Meccano product. (*Id.*) At all times during the parties' business relationship, Brio was required to maintain appropriate inventory levels. (*Id.* at § 6.1.) Brio was not allowed to distribute toys that competed against Meccano's Erector brand toys, however, Brio was allowed to sell its own Brio brand toys. (*Id.* at § 6.3.)

Brio further contends that its business strategy for its own products was heavily intertwined with its sales of Meccano products. Brio attests that its relationship with Meccano was part of a strategic plan for Brio and Meccano to transition the sales channels for these classic toys from the specialty toy sellers, for example, mom and pop type stores, to the mass market, for example, Wal-Mart and Target. Brio contends that mass market sellers were especially interested in these classic toys if there were multiple lines of toys that a dealership could offer it. Brio contends that with this intertwined sales strategy, Brio had steadily increased sales in both national and Wisconsin markets. (O'Connor Aff. ¶ 5.) The Court concludes that the Distributor Agreement between Brio and Meccano imposed significant obligations on Brio which weighs in favor of finding a community of interest and further that Brio has raised a genuine issue of material fact as to whether the parties' relationship was the type of intertwined dependent relationship that the WFDL was designed to protect.

### Facet Three: The percentage of time or revenue the alleged dealer devoted to the alleged grantor's products or services.

With respect to the percentage of time or revenue that Brio devoted to Meccano's products or services, Brio contends that it had employees dedicated solely to Meccano,

-21-

however, every single employee at Brio worked in furtherance of Meccano sales and sales objectives. (O'Connor Aff. ¶ 27.) As discussed above, according to Brio, the mutual goal of Brio and Meccano – to penetrate the mass market sellers – required an integrated, intertwined strategy. (*Id.*) Thus, Brio contends that the nature of the relationship and sales strategy did not call for independent sales people to focus solely on Meccano products. Nevertheless, Brio's sales people spent more than 50% of their efforts to expand Meccano sales channels. (O'Connor Aff. ¶ 27.) Meccano contends that Brio's interrogatory response stated that Brio's personnel devoted their time to the Erector brand at a ratio generally proportionate to Brio's annual nationwide sales of the Erector brand, which by Brio's own admission was 30-32% not 50% of annual sales. (Def.'s Resp. to PPFOF ¶ 47.)

Brio argues that there is no discrepancy between O'Connor's testimony and Brio's interrogatory response. In his affidavit, O'Connor identified the amount of time spent specifically by "Brio sales people" on efforts to expand Meccano sales channels. (O'Connor Aff. ¶ 27.) Brio contends that amount of time was 50%. Meccano's interrogatory question was different in that it asked about the amount of time devoted to Meccano products by the entire Brio organization. Brio contends that amount of time was generally proportionate to Brio's annual nationwide sales of the Erector brand, for example, 38% in 2005. The Court concludes that Brio has raised a genuine issue of material fact as to whether the percentage of time or revenue Brio devoted to Meccano's products constitutes a community of interest.

**Facet Four: The percentage of gross proceeds or profits the alleged dealer derived from the alleged grantor's products or services.**

The percentage of sales revenue derived from selling an alleged grantor's product is one of the facets for the Court to consider and indicates whether the alleged dealer has a significant financial interest in selling the alleged grantor's product. There is no bright line percentage test. The Wisconsin Supreme Court stated:

> A test for community of interest based exclusively on a fixed percentage of business time or business revenues improperly truncates the court's inquiry into the relationship between the parties, focuses the court's attention on one aspect of the business relationship to the exclusion of all others, and narrows the coverage of the statute in a manner that ill-suits a statutory definition of dealership designed to include a variety of relationships which are not all structured in the same manner.

*Ziegler*, 407 N.W.2d at 878. The court also stated that "[a] low percentage is strong evidence, evidence that might ultimately be determinative in many cases, that there is no continuing financial interest between the parties in the operation of the business and thus no community of interest." *Id.* at 880. In *Baldewein*, the court discussed the analysis applicable to determining whether a dealer is "situated in this state" compared to the analysis regarding whether a "community of interest" exists. The court stated as follows:

> [C]ourts and counsel in WFDL cases often look to sales or revenue figures first to determine whether a community of interest exists. For "community of interest" analysis, the higher the percentage of overall sales or revenue generated from the grantor's products, the less important the other indicators of "investment" become, because the loss of a significant sales-or revenue-generating product line is more easily seen as a threat to the economic health of the dealer. For the "situated in this state" analysis, the higher the percentage of Wisconsin sales or revenues generated from the grantor's products, the less important the other indicators of "investment" become, because a substantial level of sales activity in this state is more easily seen as indicative of a substantial investment in and reliance upon the Wisconsin market.

*Baldewein*, 606 N.W.2d at 152, n.9.

-23-

Brio contends that nearly 21% of its entire business was derived from sales of Meccano products. In particular, Brio contends that in 2001, Meccano's sales accounted for 6.7% of Brio's total sales. This number increased to 16.5% in 2002, 26.2% in 2003, 32.1% in 2004, and 37.7% in 2005.

Meccano looks to sales of Meccano products in Wisconsin, not nationwide. In 2001, Brio's sales of Meccano products in Wisconsin accounted for 2.3% of its total sales. For the subsequent years, the percentages were as follows: 4.1% in 2002; 4.8% in 2003; 3.8% in 2004; and 4.2% in 2005. Brio contends that Meccano's comparison of Wisconsin only sales to Brio's sales nationwide is a misleading attempt to make it appear that Brio's Meccano sales were *de minimus*.

In determining whether a community of interest exists, the Court must decide whether to consider the revenues derived nationwide, or whether to consider the revenues derived solely from sales in Wisconsin. Meccano argues that it is the percentage of Brio's Erector brand sales in Wisconsin not the percentage of Brio's Erector brand sales nationwide that is relevant to determining whether a "community of interest" exists under the WFDL. Meccano, however, offers no citation for this distinction and the Court has found none. In *Baldewein*, the Court discussed the different analysis utilized when determining whether a dealer is "situated in this state" as compared to whether a "community of interest" exists between the dealer and grantor.

> The *Baldewein* test is designed to focus the court's inquiry on the nature and extent of the dealership's development of, and investment in, and reliance upon the *Wisconsin market*. On the other hand, the [community of interest] test is designed to

> measure whether the parties have a continuing financial interest in their business relationship, and whether the business relationship is so interdependent that there is a community of interest. Thus, one test focuses on the parties' link to *Wisconsin*, while the other focuses on the parties' link with each other.

*Baldewein Co. v. Tri-Clover, Inc.*, 183 F. Supp. 2d 1116, 1120 n.7 (E.D. Wis. 2002) (citing Eric J. Meier, *When is a Business a "Wisconsin Business"?  Baldewein v. Tri-Clover: A New Multifactor Approach to the "Situated in This State" Requirement of The Wisconsin Fair Dealership Law*, 2001 Wis. L. Rev. 1403, 1426 n.151 (emphasis in original) (internal citations omitted)). The "community of interest" test should be designed to measure whether the parties have a continuing financial interest in their business relationship, and whether the business relationship is so interdependent that there is a community of interest. The Court determines that for a "community of interest" analysis the Court will focus on the "overall" sales as set forth by the Wisconsin Supreme Court in *Baldewein*.[5]

---

[5]Meccano contends that Brio's damages are limited to those which result from its sales of Meccano products in Wisconsin and cites *Morley-Murphy Co. v. Zenith*, 142 F.3d 373 (7th Cir. 1998) for Meccano's contention that the WFDL does not extend beyond the borders of Wisconsin. The United States Court of Appeals for the Seventh Circuit held that the WFDL has no extra-territorial application to "sales" outside Wisconsin, stating: "We think . . . that the Wisconsin Supreme Court would construe the WFDL as not applying to Morley-Murphy's sales of Zenith products in Minnesota and Iowa. *Id.* at 380. In *Baldewein*, the Wisconsin Supreme Court noted that any "extraterritorial application of the WFDL would, at the very least, raise significant questions under the Commerce Clause." *Baldewein*, 606 N.W.2d 145, 151, n.6 (quoting *Morley-Murphy Co.*, 142 F.3d at 397). The dealer in *Morley-Murphy* was a Wisconsin corporation, headquartered in Green Bay, Wisconsin, that operated dealerships in Wisconsin, Iowa, and Minnesota. The Seventh Circuit held that "on remand, the district court must exclude from the profits recoverable under the WFDL any amounts attributable to the termination of Morley-Murphy's right to serve states other than Wisconsin." *Morley-Murphy*, 142 F.3d at 381. In this case, Brio is a Wisconsin corporation with its headquarters in Wisconsin. Brio was granted an exclusive territory that encompassed the entire United States. Whether Brio's damages are limited to those which result from its sales of Meccano products in Wisconsin is left for another day.

-25-

In *Ziegler*, the sale of the alleged grantor's products accounted for between 1% and 8% of the total revenues which the court noted was a small percentage of Ziegler's total revenues. 407 N.W.2d at 880. In *Sales and Marketing*, the alleged dealer derived on average 23% of its revenues from the grantor's products. This is strikingly similar to the revenues Brio derived from Meccano. The Seventh Circuit noted that while the dealer was not exclusively dependent on its relationship with the grantor, "its relationship with a nationally recognized manufacturer and the revenues derived therefrom were significant." *Sales & Mktg. Assoc., Inc. v. Huffy Corp.*, 57 F.3d 602, 606 (7th Cir. 1995). In *Central Corp.*, the grantor's products accounted for 8% of revenue, however, the community of interest determination was reserved for the trier of fact. *Central Corp.*, 681 N.W.2d at 189. In *Guderjohn*, the state appellate court noted that the percentage of sales derived from the alleged grantor of between 19% and 26% "tend[ed] to show a community of interest." 507 N.W.2d at 119. In this case, over the course of the parties' relationship, Brio's sales of Meccano's products accounted for over 20% of its business. For 2005, the last year of the parties' relationship, the percentage was 38%. *See Frieburg*, 978 F.2d at 400 ("Even a proportion as low as 11% can suffice if a relationship exhibits . . . other characteristics of a community of interest."). On balance, this Court finds this facet to weigh slightly in favor of finding a community of interest.

**Facet Five: The extent and nature of the alleged grantor's grant of territory to the alleged dealer**.

Brio had the exclusive right to sell Meccano's products in the United States. Meccano was solely dependent on Brio to sell its products in the United States. "An extensive and

-26-

exclusive territory certainly weighs in favor of a dealership [for purposes of 'community of interest' analysis]." *Beloit Beverage*, 900 F. Supp. at 1108-09; *see Guderjohn*, 507 N.W.2d at 120 (lack of exclusive distributorship favored finding that there was no "community of interest"). The fact that Brio had the exclusive right to sell Meccano's products weighs heavily in favor of finding a community of interest existed.

**Facet Six: The extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos).**

With respect to Brio's use of Meccano's proprietary marks, Brio used the Erector brand name as part of its efforts to sell the product. However, Brio did not use the Erector name on its exterior signage at its warehouse or on Brio vehicles. Brio contends that Meccano's trademarks were used on Brio's website, in advertising, and were displayed prominently at trade shows and fairs. O'Connor attests that anyone viewing Brio's promotional materials would have understood Brio and Meccano to be one in the same. (O'Connor Aff. ¶ 28.) Other than O'Connor's conclusory affidavit, Brio does not present any other evidence of trademark use on Brio's website or in advertising. Brio does not offer any photographs that show Meccano's trademarks prominently displayed at a trade show or fair. *See Frieburg*, 978 F.2d at 400 (community of interest exists when, among other things, a dealer displays grantor's proprietary marks on its stationary, bank checks, business cards, brochures, and telephone directory entry). The Court determines that Brio's use of the Erector trademark appears to be *de minimus* and this one facet does not satisfy the WFDL.

**Facet Seven: The extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership.**

-27-

The extent and nature of Brio's financial investment in inventory, facilities, and good will is a facet to be considered in determining whether a community of interest existed. Brio contends that it invested significant amounts in inventory. Brio contends that it was required to purchase undesirable Meccano product that was ill-liquid. Brio did not need or want this product. (PPFOF ¶ 43.) Meccano denies that the inventory that Brio was "forced" to purchase was ill-liquid and contends that any difficulties regarding the sale of inventory was based upon Brio's incorrect purchase strategy and that Brio did not accept Meccano's advice to sell its older products to the close out channels earlier. (Def.'s Resp. to PPFOF ¶ 43.) When Meccano terminated its relationship with Brio, Brio's inventory was valued at $3,610,207. (Beilfuss Decl. ¶ 1, Ex. 1, Ingberg Dep., Ex. 14.) Brio contends that it was unable to sell the inventory upon Meccano's termination easily or without incurring a loss. Brio further contends that it lost $514,111 in the sale of unsalable Meccano inventory to liquidators. (Pl.'s Br. Opposing Meccano's Mot. for S. J. and Mot. to Dismiss at 27.) The Court determines that this is a genuine issue of material fact to be resolved by the trier of fact.

Brio also contends that it dedicated a large portion of its facilities in Germantown, Wisconsin to storage of Meccano product. Meccano product took up approximately half of Brio's warehouse. (O'Connor Aff. ¶ 25.) At his deposition, O'Connor testified as follows:

> Q    Did Brio have any other products besides Meccano products in the warehouse during the 2006 time frame?
>
> A    Yes.

Q        What percentage of the lease space, if you have an estimate even, was used for the storage of Meccano products?

A        I think it was relatively consistent with the percent of business, so in the 30, 31, 32 percent range. It was no more bulky or bigger than anything else we had. We had some plastic stuff, for example, that took up a lot of room but [was] very lightweight.

(Kwaterski Decl. ¶ 4, Ex. 4, O'Connor Dep. 228.)

Meccano contends that O'Connor's deposition testimony is inconsistent with his affidavit and that this Court should strike O'Connor's affidavit as a "sham affidavit." Brio asserts, however, that during his deposition, O'Connor was asked about inventory stored at Brio's warehouse "during the 2006 time frame." (*Id.*) The 2006 time frame was after Meccano terminated the Distributor Agreement and Brio had begun liquidating its Meccano inventory. Brio argues that O'Connor's testimony that, during this 2006 time frame, Meccano product took up warehouse space "in the 30, 31, 32 percent range" is not inconsistent with O'Connor's affidavit testimony that, during the time Brio served as Meccano's exclusive dealer, "Meccano product took up approximately half of Brio's warehouse, which was located in Germantown, Wisconsin."

In this circuit, it is well established that "a party may not create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 688 n.5 (7th Cir. 2008). The information in O'Connor's affidavit relating to Meccano inventory in Brio's warehouse relates to a different time frame than addressed by O'Connor's deposition testimony. The

-29-

Court concludes that O'Connor's deposition testimony does not directly contradict his affidavit and, therefore, will not strike O'Connor's affidavit as a "sham affidavit."

The Court, however, determines that Brio's warehouse, which was a rental property, was not devoted exclusively to Meccano products and as argued by Meccano was adaptable to other uses upon termination of the Agreement. This type of expense does not in and of itself create a community of interest. There is nothing in the record indicating that Brio could not have used this space to store other products. Moreover, the fact that the warehouse was leased indicates this was a cost of doing business and not a sunk cost.

Brio contends that it invested in promoting the goodwill of Meccano. In support of this contention, Brio states that it maintained a relationship with several "Meccano Clubs," which are groups of people who are enthusiasts for Erector product. Brio also helped to create a set for a movie about A.C. Gilbert, the inventor of the Erector toy line; gave away Meccano product to children; and had contests for building models out of Erector product. (O'Connor Aff. ¶ 24.) Brio, however, does not quantify the costs of its investment in promoting the goodwill of Meccano. Absent such quantification, Brio has failed to raise a genuine issue of material fact regarding its investment in promoting the good will of Meccano.

As previously noted, the WFDL is meant to protect those businesses that make a "substantial financial investment in inventory, physical facilities or 'good will' as part of their association with the grantor." *Foerster, Inc.*, 313 N.W. 2d at 63. With regard to Brio's investment in inventory, physical facilities and good will, the Court determines that Brio has

-30-

raised a genuine issue of material fact regarding its financial investment in inventory but not its investment in physical facilities or good will. Brio contends that it was required to purchase undesirable inventory; this inventory was not able to be sold easily; and, instead, it was sold at a loss, after the relationship was terminated. Brio contends that it lost $514,111 in the sale of unsalable Meccano inventory to liquidators. Brio's investment in inventory that Brio contends was largely ill-liquid raises a genuine issue of material fact as to whether a community of interest existed.

**Facet Eight: The personnel which the alleged dealer devoted to the alleged dealership.**

A facet to be considered in determining whether a community of interest existed is whether the dealer had personnel devoted to the grantor's business. Brio had one employee, Thompson, who worked only on Meccano. Thompson did marketing for the Erector products nationwide and was paid in part by Meccano. Brio also contends that every single employee at Brio worked in furtherance of Meccano sales and sales objectives. Brio contends that the mutual goal of Brio and Meccano was to penetrate the mass market sellers – sellers who were much more interested if the dealership offered multiple product lines. Consequently, Brio argues that the nature of the relationship and the sales strategy did not call for independent sales people to focus solely on Meccano products but instead to market a mix of multiple product lines. In *Sales and Marketing*, none of the alleged dealer's staff was devoted exclusively to selling the grantor's products. 57 F.3d at 606. In this case, there was an employee who was exclusively devoted to Meccano products and Brio attests that its employees spent more than 50% of their efforts to expand Meccano sales channels. (PPFOF

-31-

¶ 47.)  As noted above, Meccano denies this contention and notes that in its response to interrogatory questions, Brio stated that its personnel devoted their time to the Erector brand at a ratio generally proportionate to Brio's annual nationwide sales of the Erector brand. (Def.'s Resp. to PPFOF ¶ 47.)  The Court concludes that Brio has raised a genuine issue of material fact as to whether the amount of time that its personnel devoted to Meccano helps to establish a community of interest.

> **Facet Nine: How much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services.**

A facet to be considered in determining whether a community of interest exists is how much the dealer spends on advertising or promotional expenditures for the grantor's products or services.  Brio contends that it spent significant amounts on advertising and promotion of Meccano products, including an annual expense of $150,000 to present Meccano products at the New York Toy Fair; an annual expense of $80,000 to lease a showroom at the Toy Fair; and, annual marketing expenses of $85,000 to $90,000.  (DPFOF ¶¶ 23, 26.) Meccano contends that Brio does not submit any evidence that its participation at these shows was Meccano-specific or that Brio would not have attended these shows absent Meccano's encouragement.  *See Super Natural Distrib., Inc.*, 196 F. Supp. 2d at 774 (granting summary judgment to supplier and finding that WFDL did not apply because there was no "community of interest" where there was "[n]o evidence . . . presented that attendance at these [trade] shows was 'MuscleTech-specific' or that Super Natural would not have attended these shows absent MuscleTech's encouragement").

The Court concludes that the sums expended by Brio are not negligible. Moreover, the percentage of Brio's business derived from Meccano products was substantially higher than what the alleged dealer derived from the grantor's business in *Super Natural* and Brio's business with Meccano was more intertwined than the business relationship in *Super Natural*. The Court concludes that Brio has raised a genuine issue of material fact as to whether its expenditures on advertising and promotion of Meccano's products constitutes a community of interest.

### Facet Ten: The extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services.

With respect to supplementary services Brio provided for Meccano's products, Brio had a dedicated employee who dealt with customer complaints related to Meccano's products, such as returns, warranty issues, and, lost or missing parts. The Wisconsin resident representative who handled customer service for Meccano products was paid approximately $20,000 to $25,000 per year. Brio contends that it further stocked large quantities of spare or replacement parts that it would send to customers when they complained that a part was missing, damaged, or lost. Brio also stocked approximately $10,000 in Meccano replacement parts in its Germantown, Wisconsin warehouse. Brio also paid to transport these parts.[6] (PPFOF ¶ 46.) This factor weighs slightly in favor of finding a community of

---

[6]Meccano contends that the facts relating to facet ten should be disregarded by the Court because Brio did not list any of these investments in its interrogatory responses. Meccano asked the following interrogatory: "State the complete factual basis for your contention . . . that Brio 'invested substantial resources and efforts in promoting and distributing Meccano's Erector products under the Distributor Agreement.'" (Kwaterski Suppl. Decl. ¶ 2, Ex. A., at 7.) In response, Brio made the standard objection that Brio is not presently capable of describing the complete factual basis for its contention that it invested substantial resources and efforts in promoting and distributing Meccano's

-33-

interest.  The Court concludes that Brio has raised a genuine issue of material fact as to

whether the supplementary services provided to Meccano constitute a community of interest

As noted in the authoritative treatise on the WFDL "[o]ne can examine a relationship

until one is cross-eyed – looking at its various facets, trying to decide whether they imply a

community of interest, and then trying to decide how much each facet should count – yet end

up feeling uncertain about the conclusion."  Michael A. Bowen and Brian E. Butler, *The

Wisconsin Fair Dealership Law* § 4.33 (3rd ed. 2003).  As guided by this treatise, the Court

looks to the following statement of the Wisconsin Supreme Court, albeit dicta:

> When a dealer sinks substantial resources into its relationship with a particular
> grantor – time, money, employees, facilities, inventory, advertising, training
> – or derives substantial revenue from the relationship (as a percentage of its
> total), or some combination of the two, the grantor's power to terminate,
> cancel, or not renew the relationship becomes a substantial threat to the
> economic health of the dealer and a community of interest can be said to exist.

*Baldewein,* 606 N.W.2d at 151.

In weighing the various *Ziegler* facets of the parties' relationship that bear upon the

community of interest question, this Court is obligated to construe the facts in a light most

favorable to Brio.  With regard to the ten facets, the Court concludes that the following facets

raise genuine issues of material fact as to whether a community of interest existed: the

obligations imposed on Brio by the Distributor Agreement, the percentage of time or revenue

_____

Erector products until the conclusion of discovery.  Brio, however, set forth as part of its answer to
the interrogatory that Brio incurred customer service and replacement costs as a result of defective
manufacturing by Meccano and its suppliers.  Brio further attested that in addition to managing all of
Meccano's safety certifications with the Consumer Product Safety Commission, Brio was also called
on by Meccano to coordinate replacement parts resulting from defective manufacturing or missing
components.  (*Id.* at 11.)  The Court concludes that Brio's interrogatory answer was sufficient.

Brio devoted to Meccano's products, Meccano's requirement and Brio's practice of keeping a substantial amount of Meccano's product in inventory; Brio's expenditures on advertising or promoting Meccano's products; and Brio's provision of supplementary services. Brio's exclusive relationship with Meccano and the percentage of gross proceeds or profits derived from Meccano's products are indicative of a community of interest but these facets are to be analyzed in conjunction with the other facets that raise genuine issues of material fact. Brio's use of the Erector trademark does not raise an issue of fact as to whether a community of interest existed.

For over four years, Brio was the exclusive distributor of Meccano's products in the United States. The Distributor Agreement placed several obligations upon Brio that indicated a certain degree of interdependence. Most significantly, Brio had the exclusive right to sell Meccano's products in the United States. This factor weighs heavily in favor of finding a community of interest. Although Brio could sell its own products, it was prohibited from selling other products that competed with Meccano. Brio derived on average 21% of its revenues from Meccano products. In the last year of their relationship, Meccano's products constituted 37.7% of Brio's total sales. This significant percentage of business is an important indicator that there is a community of interest. As previously noted, in *Central Corp*, the Wisconsin Supreme Court determined that a community of interest may exist when the alleged grantor's products accounted for 8% of revenue.

The Distributor Agreement also required Brio to purchase significant amounts of inventory. Brio made a substantial investment in inventory and contends that it was unable

-35-

to realize a return on its investment by selling the inventory. Brio contends that it was forced to purchase inventory that ultimately proved to be ill-liquid. Brio's sale of Meccano inventory, and the profits or lack thereof realized, is one of the genuine issues of material fact before this Court.

A dealer entitled to WFDL protection should have a financial stake in the relationship large enough to make a grantor's power to terminate the agreement a threat to the economic health of the grantee. While Brio was not exclusively dependent on its relationship with Meccano, its relationship with an international manufacturer and the resultant revenues were significant to its business. Brio contends that Meccano's termination caused such a significant impact on Brio's business that Brio's business collapsed. Brio attests that it was put out of business by Meccano's termination of the relationship. In other words, Brio contends that Meccano had Brio "over a barrel."

Meccano underscores the testimony from O'Connor, Brio's President, that Brio was already struggling financially when it became Meccano's exclusive distributor because of declining sales in the Brio brand and substantial losses that had been generated over several years. (Kwaterski Decl. ¶ 4, Ex. 4, O'Connor Dep. 55-56.) Ingberg also testified that he was shown documents indicating that Brio could survive with or without the Erector brand and these same documents indicated that Brio viewed Meccano as a "nonstrategic" product line. (*Id.* at ¶ 5, Ex. 5, Ingberg Dep. 49-50.) The reason for Brio's ultimate demise is contested. Did Meccano have Brio over the proverbial barrel or was Brio already in dire financial straits when the parties entered into their relationship? At the summary judgment stage, Brio has

-36-

raised a genuine issue of material fact as to whether it had a stake in the relationship large enough to make Meccano's power to terminate, a threat to the economic health of Brio. *See Ziegler*, 407 N.W.2d at 879.

Further, Brio has raised a genuine issue of material fact as to Brio and Meccano's "interdependence" or the parties' "shared goals and a cooperative effort more significant than in the typical vendor-vendee relationship." *Id.* Brio was Meccano's exclusive distributor in the United States for its Erector products. Brio contends that it gained a sustainable and growing business within the specialty toy retail market. Brio further contends that Meccano and Brio began to develop an Erector line to pursue the mass market channel of the United States toy business. Meccano disputes Brio's success within the specialty toy retail market and contends that Brio could have done a better job with respect to its service of the speciality toy market.

When the Court assesses the two *Ziegler* "guideposts," Brio invested significant sums in grantor-specific inventory which demonstrates the requisite "continuing financial interest," however, Brio's investment in inventory that Brio contends was largely ill-liquid raises a genuine issue of material fact as to whether a community of interest existed given Meccano's contention that Brio's poor performance was one of the reasons for the large amount of inventory. Further, there is a genuine issue of material fact as to the parties' "interdependence."

The Court concludes that there are genuine issues of material fact as to whether a community of interested existed and, therefore, this case cannot be resolved on summary

-37-

judgment. In keeping with the precedent as set forth in *Central Corp.*, the Court concludes that this case should proceed to trial, so that a fact finder may determine whether a community of interest existed between Brio and Meccano.

Meccano also contends that the relationship between Brio and Meccano was not "situated in" Wisconsin. Meccano argues that the relationship between a manufacturer and a distributor, rather than the location of the distributor itself, must be "situated in" Wisconsin. Meccano contends that, although Brio's warehouse was physically located in Wisconsin, Brio's sales of Meccano products in Wisconsin accounted for only 4.8% of Brio's sales in Brio's best year of selling Meccano products and that this level of business does not establish that Brio's relationship with Meccano was situated in Wisconsin.

Brio argues that it is a Wisconsin corporation. Brio was incorporated in Wisconsin; its corporate headquarters and all of its warehouses were in Wisconsin; it paid taxes in Wisconsin; and, it hired 75 Wisconsin residents, who in turn paid taxes in Wisconsin. Further, Brio acquired and stored large amounts of inventory in its Wisconsin facilities. Also, Brio grew Meccano good will in the Wisconsin market. In particular, Brio contends that it maintained relationships with Meccano clubs in Racine and Madison, Wisconsin, and held an annual event at its Germantown headquarters that coincided with the Great Circus Train coming into town. Meccano products were not only displayed and sold at this event, but Brio also included giveaways of Meccano product and Meccano product demonstrations. (DPFOF ¶ 49.) Brio also contends that its sales in Wisconsin demonstrate the development of the Wisconsin market.

-38-

In order to be considered a "dealer" under the WFDL, Brio must qualify as a "person who is a grantee of a dealership situated in this state." *See Baldewein*, 183 F. Supp. 2d at 1119 (discussing the amendment of the WFDL in 1977 to add the phrase "situated in this state" to Wis. Stat. § 135.02(2) and noting that the phrase has caused considerable confusion, mainly among federal courts sitting in diversity). The Wisconsin Supreme Court determined that the multiple factor "community of interest" test in *Ziegler* can be adapted to whether an alleged dealer is situated in Wisconsin. In order to determine whether Brio is situated in Wisconsin, the Court is to consider the following nine factors enumerated by the Wisconsin Supreme Court:

> (1) percent of total sales in Wisconsin (and/or percent of total revenue or profits derived from Wisconsin); (2) how long the parties have dealt with each other in Wisconsin; (3) the extent and nature of the obligations imposed on the dealer regarding operations in Wisconsin; (4) the extent and nature of the grant of territory in this state; (5) the extent and nature of the use of the grantor's proprietary marks in this state; (6) the extent and nature of the dealer's financial investment in inventory, facilities, and good will of the dealership in this state; (7) the personnel devoted to the Wisconsin market, (8) the level of advertising and/or promotional expenditures in Wisconsin; and (9) the extent and nature of any supplementary services provided in Wisconsin.

*Baldewein*, 606 N.W.2d at 152. The Supreme Court did not intend this list to be all-inclusive. "The inquiry should focus on the nature and extent of the dealership's development of, investment in and reliance upon the Wisconsin market." *Id.*

This Court notes that the legislative response in amending the WFDL was a response to two federal cases which had applied the WFDL to non-Wisconsin dealers operating under agreements containing Wisconsin choice-of-law provisions. *See C.A. May Marine Supply*

-39-

*Co. v. Brunswick Corp.*, 557 F.2d 1163 (5th Cir. 1977) and *Boatland, Inc. v. Brunswick Corp.*, 558 F.2d 818 (6th Cir. 1977). In *Baldewein*, the Supreme Court noted that the focus is to be on the substance of the dealership, not the location of the dealer. Is this analysis required in this case, where Brio, unlike the alleged dealer in *Baldewein*, has its corporate headquarters Wisconsin, conducts its business in Wisconsin, maintains all inventory in a warehouse in Wisconsin and has some sales but not all sales in Wisconsin? Brio has demonstrated meaningful connection to Wisconsin but this is not the stated test in *Baldewein*.

The cases cited by Meccano for its contention that Brio was not "situated in" Wisconsin involve either businesses physically located outside of Wisconsin attempting to invoke the protections of the WFDL or businesses that, while physically located in Wisconsin, did little or no business within Wisconsin's borders. *See Baldewein Co.*, 183 F. Supp. 2d at 1116-18, 1125 (E.D. Wis. 2002) (holding alleged dealer was not situated in Wisconsin where alleged dealer was an Illinois corporation with its principal place of business in Franklin Park, Illinois and level of sales in Wisconsin was 4% in the last five years of 51-year history); *Swan Sales Corp. v. Joseph Schlitz Brewing Co.*, 374 N.W.2d 640, 644 (Wis. Ct. App. 1985) (holding alleged dealer was not situated in Wisconsin where alleged dealer, while located in Wisconsin, did not make a single sale of Schlitz product in Wisconsin but instead promoted Schlitz sales to the American military overseas); *Super Natural Distrib., Inc.*, 196 F. Supp. 2d at 779-80 (holding alleged dealer was not situated in Wisconsin where alleged dealer's physical plant was located in Wisconsin, however, the state

-40-

of incorporation is not disclosed in the court's decision, and sale of alleged grantor's product constituted less than 1% of its total sales).

The Court has already considered most of the *Baldewein* factors already in its community of interest analysis. The important factor not previously discussed is the first factor, which is the percentage of the dealership's total sales in Wisconsin. From 2001 to 2005, the highest sales figure for Wisconsin was 4.8% in 2003 of Brio's total sales of Meccano products that year, the lowest sales figure for Wisconsin was 2.3% in 2001. The Wisconsin Supreme Court recognized that Wisconsin sales percentages are highly significant to the analysis. "In many cases, the dealer's level of sales in Wisconsin may be the single most influential factor in determining whether the dealer is situated [in Wisconsin]." *Baldewein*, 606 N.W.2d at 152. The Court further noted that "the higher the percentage of Wisconsin sales or revenues generated from the grantor's products, the less important the other indicators of 'investments' become, because a substantial level of sales activity in this state is more easily seen as indicative of a substantial investment in and reliance upon the Wisconsin market." *Id.* at 152 n.9. In *Baldewein*, this Court determined that a dealership was not situated in Wisconsin where distributor's sales in Wisconsin never accounted for more that 7% of its total sales. In this case, however, while Brio's sales in Wisconsin were never more than 4.8% of total sales, Brio's nationwide sales of Meccano product accounted for 21% of its overall business, and sales in the Wisconsin market were growing. While this is an influential factor, the Court must look to all nine factors enumerated by the Wisconsin Supreme Court.

The second factor listed is the length of the parties' dealings in Wisconsin. As previously discussed, Brio and Meccano entered into a distribution agreement in May 2001 and, thus, the parties' relationship in Wisconsin was less than five years. The third factor listed is the extent and nature of the obligations imposed on the dealer regarding operations in Wisconsin. The record indicates that Meccano imposed significant requirements on Brio, including minimum amount of annual sales of Meccano products and maintenance of a certain amount of inventory. The fourth factor is the extent and nature of the grant of territory in Wisconsin. It is undisputed that Brio was granted the exclusive right to sell Erector brand products in Wisconsin from 2001 to 2005 as part of a nationwide appointment. This "extensive and exclusive territory" certainly weighs in favor of a dealership. *Beloit Beverage*, 900 F. Supp. at 1109.

. The fifth factor is the extent and use of Meccano's proprietary marks. Meccano contends that Brio has not produced any evidence specifically addressing the extent and nature of its use of Meccano's proprietary marks in Wisconsin. As discussed in *Baldewein*, in the absence of more specific evidence, the Court is left to assume that the extent and nature of Brio's use of Meccano's proprietary marks in Wisconsin would be roughly proportional to the percentage of sales to Wisconsin customers

The sixth factor is the extent and nature of Brio's financial investment in inventory, facilities, and good will in the state. As previously determined, only Brio's investment in inventory that Brio contends was largely ill-liquid raises a genuine issue of material fact as to whether a community of interest existed. The Court further concludes this issue also raises

-42-

a genuine issue of material fact as to whether Brio was situated in this state. The seventh factor is the personnel devoted to the Wisconsin market. Brio did not identify any personnel specifically devoted to the Wisconsin market. Brio had one employee dedicated to the marketing of Meccano products nationwide and Meccano paid for half of that employee's salary. Brio, however, argues that its sales strategy did not require an employee to devote their time exclusively to the Wisconsin market. As previously concluded, Brio has raised a genuine issue of material fact as to whether the amount of time that its personnel devoted to Meccano helps to establish a community of interest. The Court further concludes that this issue also raises a genuine issue of material fact as to whether Brio was situated in this state.

The eighth factor is the level of advertising in Wisconsin. Brio has not submitted any evidence as to how much of its advertising budget was devoted to advertising in Wisconsin. The ninth factor is with respect supplementary services. Brio contends that it stocked approximately $10,000 in replacement parts, missing parts, and Meccano damaged product, and handled warranty issues from its Wisconsin offices. Brio also paid for the transportation of these parts. As previously concluded, this issue raises a genuine issue of material fact as to whether a community of interest existed. The Court further concludes that his issue raises a genuine issue of material fact as to whether Brio was situated in this state.

In conclusions, Brio is a Wisconsin corporation and its warehouse and employees were located in Wisconsin. Moreover, Brio did business within the geographic confines of the state of Wisconsin which distinguishes its situation from *Swan Sales*. In *Supernatural*, a parties' relationship was not "situated in" Wisconsin despite the fact that the distributor's

-43-

physical plant (and presumably its employees) was located in Waukesha, Wisconsin, because its sales of Muscletech products in Wisconsin constituted less than 1% of its total sales. 196 F. Supp. 2d at 779. This case, however, is distinguishable from *Supernatural*. Brio is a Wisconsin corporation and its sales in Wisconsin were not zero as in *Swan* or less than 1% as in *Supernatural*. In fact, Brio's sales in Wisconsin in 2003 accounted for 4.8% of its business. As argued by Brio, a review of the factors demonstrates that Brio had Wisconsin specific connections and investments, and, therefore, a fact finder could conclude that Brio was situated in Wisconsin under the WFDL. The Court determines that the many Wisconsin connections set forth by Brio preclude entry of summary judgment against it.

Therefore, the Court concludes that Brio's WFDL claim may proceed to trial, however, the Court will also address Brio's contention that there is a dispute as to whether the parties' written Distributor Agreement was in effect in September of 2005. Meccano speculates that Brio fears that the dismissal of its WFDL claim will cause the Court to send the balance of this case to the French court in Calais and so Brio has changed course to now assert that the written Distributor Agreement was not in effect.

Brio's contention that the parties' written Distributor Agreement was not in effect in September 2005 is contradicted by its own allegations and admissions throughout this litigation. In its pleadings over the past three years, Brio asserted that: "[i]n September, 2005, Meccano notified Brio that it was unilaterally terminating the Distributor Agreement." *See* Compl. ¶ 7 (filed April 2006); Am. Compl. ¶ 10 (filed Jan. 2008); Supp. & Am. Compl. ¶ 10 (filed Dec. 2008). In its breach of contract claim, Brio asserted that "Brio and Meccano

-44-

are parties to a valid and enforceable agreement, whereby Meccano granted to Brio the exclusive right to sell various toys within the United State of America, under Meccano's well-know Erector brand." Supp. & Am. Compl. ¶ 19. Brio further contended that Brio fulfilled is obligations under the contract and that Meccano breached ths contract. *Id.* at ¶¶ 20-21. In response to an interrogatory, Brio asserted that "[a]t no time, whether prior to or after the termination of the Distributor Agreement, had Meccano ever notified Brio that Meccano considered it to be in breach of the Distributor Agreement, and Meccano agreed to renew the Distributor Agreement each year prior to its termination [in September, 2005]." (Suppl. Kwaterski Decl. ¶ 2 , Ex. A, Brio's Resp. to Interrog. No. 14.)

Brio offers the deposition testimony of Ingberg in support of its contention that Brio and Meccano "had jettisoned [the Distributor Agreement] since at least early 2004." (Pl.'s Resp. Br. 7.) Brio contends that Ingberg acknowledged that the parties were "operating without a contract." (Pl.'s Resp. Br. 22.) Brio also points to an email from O'Connor to Ingberg which referenced that Brio was "operating without a contract." (Kwaterski Decl. ¶ 8, Ex. 8.)

At his deposition, Ingberg identified the email from him to O'Connor, which provided the termination notice, and testified that he was "nonrenewing their distribution right." (Kwaterski Decl. ¶ 5, Ex. 5, Ingberg Dep. 142:17-22.) Ingberg's testimony further referred to negotiations that the parties were engaged in to reach a more inclusive long-term contract, although that contract was never implemented. The Court has reviewed the testimony of Ingberg and Ingberg did not testify that the parties were operating without a contract.

Moreover, O'Connor testified at his deposition that in that particular email, he was referring to Brio's desire for a new long-term contract. (Kwaterski Decl. ¶ 4, Ex. 4, O'Connor Dep. 133-34.)

> Q: And then in Section B in there you say we are operating without a contract. What did you mean by we are operating without a contract?
>
> A: What I meant there was a long-term contract. We had the annual revolving contract but what we were looking for was a more long-term agreement.
>
> Q: Okay. So you still believe that there was a written contract?
>
> A: There was definitely an operating agreement between the two parties.

(*Id.*) The deposition testimony from O'Connor is clear that the parties were operating under the written Distributor Agreement, however, Brio was interested in a long-term agreement. There is no evidence that a different longer term agreement was ever implemented by the parties or that while the parties negotiated for that longer term contract, the Distributor Agreement was not in full force and effect.

Finally, the plain language of the Distribution Agreement states that the Agreement automatically renews for each calendar year, unless one of the parties provided three months notice to the other. (Kwaterski Decl. ¶¶ 1-2, Exs. 1 & 2 at § 3.) There is no evidence that any notice of nonrenewal was provided in 2004. In fact, O'Connor testified that the Distributor Agreement automatically renewed for the calendar year. (*Id.* at ¶ 4, Ex. 4, O'Connor Dep. 78:3-21.) The Court concludes that the Distribution Agreement was in full force and effect in September of 2005 when Meccano provided the notice of nonrenewal. Meccano provided three months written notice of its intent that the Distributor Agreement

-46-

would not be automatically renewed for the calendar year of 2006. The issue remains, however, whether the WFDL affords protection to Brio to prevent the actions taken by Meccano.

The Distributor Agreement was entered into by sophisticated business entities which included a forum selection clause. Forum selection clauses are *prima facie* enforceable. *See Nw. Nat. Ins. Co. v. Donovan*, 916 F.2d 372, 378 (7th Cir. 1990). A forum selection clause should be honored by the parties "absent some compelling and countervailing reason." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12 (1972). A "strong presumption" in favor of the enforcement of international forum selection clauses exists, and the burden is on Brio to make a clear showing that the clause here should not be enforced. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, *Inc.*, 473 U.S. 614, 631 (1985). "The rule of law in Wisconsin is that a forum selection clause is enforceable unless the contract provision is substantively unreasonable in view of the bargaining power of the parties." *Beilfuss v. Huffy Corp.*, 685 N.W.2d 373, 378 (Wis. Ct. App. 2004).

Brio is a sophisticated commercial entity and an experienced toy distributor that sold not only Meccano's Erector-brand toys, but also the Brio's brand of toys. Brio and Meccano agreed in plain, concise language, "irrevocably [to] submit [to] the exclusive jurisdiction of the Tribunal de Commerce de Calais, FRANCE." (Kwaterski Decl. ¶ 1, Ex. 1 at § 14.) The language of the Distributor Agreement reflects the parties' intent to resolve disputes in the Commercial Court of Calais. There is no evidence of any disparity in bargaining power.

-47-

According to Brio, sending this dispute to France would offend public policy because in the European Union, the attorney-client privilege only extends to attorneys admitted to practice before the European Union. (Pl.'s Resp. Br. 35-36.) This argument is not persuasive. "The dominant policy in contract cases is enforcing the parties' agreement, the better to promote commerce." *Omron Healthcare, Inc. v. Maclaren Exports Ltd.*, 28 F.3d 600, 603 (7th Cir. 1994) (citation omitted). The Seventh Circuit further stated, "American firms can hardly expect to do international business if American courts permit them to welch on their commitments to their trading partners." *Id.* Brio and Meccano entered into an agreement whereby they agreed to submit to the exclusive jurisdiction of the Tribunal de Commerce de Calais, France. Brio, however, is able to break this agreement by invoking the protections of the WFDL, which may apply to the parties' business relationship.

Section 13.2 of the parties' Distribution Agreement provides for the repurchase of Brio's inventory at Meccano's "sole discretion." (Kwaterski Decl., Ex. 1 at § 13.2.) The December 6, 2005, email setting forth Meccano's proposal regarding Brio's outstanding, inventory, Brio's counterproposal, as well as the ensuing negotiations regarding the repurchase of inventory, provide the basis for Brio's claims in this litigation. Given that the forum selection clause in the Distributor Agreement explicitly states that the Agreement "shall be governed and construed in accordance with the laws of France and the parties hereto hereby irrevocably submit [to] the exclusive jurisdiction of the Tribunal de Commerce de Calais, France," and that the Distributor Agreement sets forth a provision for the repurchase of inventory, a dispute arising from Meccano's conduct in repurchasing Brio's

-48-

inventory arises under the Distributor Agreement and falls under that Agreement's forum selection clause.

In conclusion, the Court determines that genuine issues of material fact exist as to whether a community of interest exists and whether Brio is situated in Wisconsin. Therefore, genuine issues of material fact prevent the Court from determining upon summary judgment whether there is a dealership relationship between Brio and Meccano under the WFDL. Consequently, a trial is warranted in this case to determine whether the WFDL is applicable before addressing whether Meccano is entitled to summary judgment on Brio's breach of contract claim, promissory estoppel claim, and breach of the duty of good faith claim. The Court informs the parties that if upon trial of this matter, the Court determines that the parties' relationship does not fall within the ambit of the WFDL, it will transfer the action to the Tribunal de Commerce de Calais, France, in keeping with the express terms of the parties' Distributor Agreement.

## ORDER

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

Meccano's Motion for Summary Judgment (Docket #71 ) is **DENIED.**

**IT IS FURTHER ORDERED** that the Court will schedule a conference call for March 11, 2010 at 9:30 A.M. to discuss the possibility of mediating before the randomly assigned magistrate judge, the Honorable William E. Callahan, Jr., and to set a court trial date to determine whether the WFDL is applicable. The Court will initiate the call.

-49-

Dated at Milwaukee, Wisconsin, this 10th day of February, 2010.


BY THE COURT

_s/ Rudolph T. Randa_
**HON. RUDOLPH T. RANDA**
**United States District Judge**